IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**JAMES P. GONZALEZ,**   Case 5:14 CV 2322

    Plaintiff,

    v.   Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.   MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Plaintiff James P. Gonzalez ("Plaintiff") filed a complaint against the Commissioner of Social Security ("Commissioner"), seeking judicial review of the Commissioner's decision to deny Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to 42 U.S.C. § 405(g). (Doc. 1). The parties consented to the jurisdiction of the undersigned in accordance with 28 U.S.C. § 636(c) and Local Rule 72.2(b)(1). (Doc. 15). For the following reasons, the Commissioner's decision is affirmed.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI on January 31, 2011, alleging impairments of "Bi-polar" and "add adult" [sic]. (Tr. 253, 257, 294). He alleged a disability onset date of October 15, 2008[1] (Tr. 253), and a date last insured of December 31, 2010 (Tr. 265). Social security denied Plaintiff's claims initially (Tr. 205), and upon reconsideration (Tr. 216). Plaintiff requested a hearing before an administrative law judge ("ALJ"). (Tr. 229). An ALJ held a hearing on

---

1. Plaintiff later requested to amend his onset date to November 1, 2010 (Tr. 284), however, in her decision, the ALJ noted the request "is expressly conditioned on a favorable decision being granted", and, therefore, did not accept the amended date. (Doc. 13, at 90).

February 26, 2013, at which Plaintiff, represented by counsel, and a vocational expert ("VE") testified. (Tr. 117). Following the hearing, the ALJ found Plaintiff not disabled. (Tr. 87). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1). Plaintiff filed the instant action on October 17, 2014. (Doc. 1).

## FACTUAL AND MEDICAL BACKGROUND

**Personal Background**

Plaintiff's date of birth is November 18, 1969. (Tr. 253). He completed tenth grade and later earned a GED. (Tr. 137). Most significantly, his relevant past work experience consisted of being a maintenance worker and ownership of a business which installed graphic signs and displays for home improvement stores. (Tr. 123). Plaintiff had four adult children and one minor child, who lived with him and his wife. (Tr. 137).

**Hearing Testimony**

Plaintiff testified he worked various jobs for short periods of time before termination or resignation due to tardiness, absenteeism, anger, or difficulty getting along with others. (Tr. 125-27). He alleged difficulty controlling anger, anxiety attacks when around others, nervousness, and difficulty sleeping. (Tr. 127-28, 133). Crowds of people allegedly exacerbated these symptoms, so he attempted to avoid large crowds. (Tr. 128). He reported increasing anger symptoms, including punching walls. (Tr. 133). ("I'm like a ticking bomb, I never know when it's going to go off.") (Tr. 144).

On a typical day, he testified he prepared his young son for school in the morning because his wife was at work. (Tr. 133-34). After his son left on the bus, Plaintiff testified he would watch television or go back to sleep. (Tr. 134). He reported preparing his own lunch and watching television until his son returned from school in the late afternoon. (Tr. 134-35). He

2

prepared dinner when his wife worked late, and performed household chores, including laundry and some yard work. (Tr. 135, 140). Three or four times a week Plaintiff reported leaving the house to run errands. (Tr. 135-36). Plaintiff's hobbies included using the computer, reading, drawing, completing puzzles, and creating wood projects. (Tr. 136-37). He admitted non-compliance with prescription medication in the past (Tr. 131), a past problem with abusing alcohol, and subjecting his children to "mental abuse" (Tr. 138, 142). He attempted to complete an anger management program, but failed to see it to fruition due to anxiety. (Tr. 142-43). He also reported a suicide attempt in 2006. (Tr. 124).

A VE also testified at the hearing. She opined Plaintiff's past relevant work consisted of work as a house repairer and a sign installer. (Tr. 146). She noted both positions are skilled positions, but Plaintiff did not work in either position long enough to show he had the skills required. *Id.* The ALJ, however, noted he appeared to work as sign installer for more than just one year. (Tr. 147). The VE also mentioned he performed both jobs at the customary medium level. (Tr. 146).

The ALJ then presented the VE with a series of hypothetical questions. First, the ALJ asked the following:

> The first hypothetical question concerns an individual of the claimant's age, education, and past relevant work experience. In this first hypothetical, this individual has no exertional limitations. This individual has mental limitations, but is able to understand, remember, and carry out simple, routine tasks that can be learned in 30 days or less. I'd like these tasks to be repetitive, such the environment is relatively static and low stress, which I'm going to define as precluding work that involves high production quotas such as piece work or assembly line work, strict time requirements, arbitration, negotiation, confrontation, directing the work of others or being responsible for the safety of others. And lastly in this first hypothetical, I'd like this individual to have limited and superficial interaction with coworkers and the public. With this [RFC], could such an individual return to their past relevant work?

3

(Tr. 147-48). The VE responded the individual would not be able to return to his past relevant work and would not have any transferrable skills. (Tr. 148). The VE did, however, believe there were other jobs in the national economy, of which the individual could perform, including housekeeping cleaner, commercial cleaner, and day worker. (Tr. 148-49).

The ALJ then asked a second hypothetical question of whether a similarly situated individual limited to medium exertion with the same non-exertional limitations could perform work. (Tr. 149). The VE responded the individual could perform the jobs of commercial cleaner and day worker at medium exertional level; hand packager; and housekeeper cleaner, which is light work. (Tr. 149-50).

The ALJ next posed the following hypothetical question involving an individual of the same age and education as Plaintiff:

> In this hypothetical, this individual would be again limited to medium exertion. They'd be limited to simple, routine tasks and be limited to 30 days or less, repetitive tasks, such the environment is relatively static and again low stress tasks, which preclude high production quotas such as piece work or assembly line work, strict time requirements, arbitration, negotiation, confrontation, directing work of others or being responsible for the safety of others. And in this hypothetical, this individual should have no direct contact with the public, meaning the public could be present in the workplace, but this individual would not need to answer questions or otherwise interact in any way during the normal performance of his duties and would have limited and superficial interaction with coworkers. With this [RFC] are there any jobs for an individual so impaired?

(Tr. 150).

The VE opined the individual could perform the hand packager position, commercial cleaner position, and kitchen helper position. (Tr. 150-51). The ALJ then asked if the individual in any of the first three hypotheticals would be able to perform any work if he would also be off-task twenty percent of the workday or more. (Tr. 151). The VE noted there would not be any work for this individual. *Id.* The ALJ then asked whether there would be any jobs for the

4

individual, if in addition to the limitations posed in the first three hypotheticals, the individual also missed two or more days of work per month. The VE opined there would not. *Id.*

**State Agency Reviewers**

Regarding Plaintiff's mental health impairments, Robelyn Marlow, Ph.D. opined Plaintiff had mild restrictions of activities of daily living; moderate difficulties in maintaining social function; moderate difficulties in maintaining concentration, persistence, or pace; and "one or two" repeated episodes of decompensation, each of extended duration. (Tr. 162).

Specifically, Dr. Marlow opined Plaintiff had moderate limitations in the following areas: ability to understand and remember detailed instructions, ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods, ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, ability to interact appropriately with the general public, ability to accept instructions and respond appropriately to criticism from supervisors, and ability to respond appropriately to changes in the work setting. In all other areas, she opined Plaintiff was "not significantly limited". (Tr. 164-65).

Dr. Marlow ultimately determined Plaintiff retained the ability to work in positions with superficial interaction with others, where change could be explained, and those positions not requiring fast-paced or high production demands. (Tr. 165). She also noted there was a treating source opinion, dated November 5, 2010, in the record that was more restrictive than her findings, but she rendered that opinion less persuasive because it was without substantial support from other evidence in the record. (Tr. 166).

On reconsideration, the state reviewing psychologist, Bonnie Katz, Ph.D., provided the same mental RFC as in the initial denial. (Tr. 186-89).

**ALJ Decision**

On April 19, 2013, the ALJ issued an unfavorable decision finding Plaintiff not disabled. (Tr. 87). The ALJ noted Plaintiff had "acquired sufficient quarters of coverage to remain insured through December 31, 2010" and required him to establish disability on or before that date. (Tr. 91). She determined Plaintiff had the following severe impairments: bipolar disorder, attention-deficit disorder ("ADD"), personality disorder not otherwise specified, a history of alcohol abuse in remission, and non-displaced fractures of the L1-L3 transverse processes. (Tr. 93).

The ALJ noted none of these impairments, or combination of impairments, met or medically equaled the severity of one of the listed impairments in 20 C.F.R. part 404, Subpart P, Appendix 1. (Tr. 94). In determining Plaintiff's mental impairments did not meet a listing, the ALJ gave "great weight to and adopt[ed] the ratings of [Plaintiff]'s 'paragraph B' criteria assessed by State Agency psychological consultants Robelyn Marlow, Ph.D., and Bonnie Katz, Ph.D." *Id.* The ALJ ultimately determined Plaintiff had the residual functional capacity ("RFC") to perform medium work with the following limitations:

- Can understand, remember, and carry out simple and routine tasks that can be learned in 30 days or less, which tasks are also repetitive such that the environment is relatively static;
- Is limited to 'low-stress' work, defined as precluding tasks that involve high production quotas (such as piecework or assembly line work), strict time requirements, arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety of others;
- Can have no direct contact with the public, meaning that the public can be present in the workplace but he would not need to answer question[s] or otherwise interact in any way with them during the normal performance of his duties; and
- Can engage in limited and superficial interaction with co-workers.

(Tr. 96).

After a review of all the evidence, the ALJ found Plaintiff's impairments could reasonably be expected to cause his alleged symptoms, but his statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible. (Tr. 97). She determined Plaintiff was unable to perform his past relevant work of maintenance worker and sign installer, but could perform other jobs in the national economy that existed in significant numbers. (Tr. 103-05).

**Relevant Mental Medical Evidence[2]**

In early 2007, Plaintiff spent nine days in the hospital for progressive depression with suicidal ideation. (Tr. 410-16). His diagnoses at discharge included bipolar disorder (depressed phase) and attention deficit disorder (adult). *Id.* Treatment notes in the record reveal this was Plaintiff's first inpatient stay for psychiatric issues. (Tr. 412).

Plaintiff began treatment for his mental impairments at Northeast Ohio Behavioral Health on January 15, 2008, with Cynthia Keck-McNulty, Ph.D., P.C.C. (Tr. 342). On an intake/diagnostic assessment, Plaintiff admitted to non-compliance with medication. (Tr. 344). Dr. Keck-McNulty noted Plaintiff had average intelligence; appropriate orientation in time, place, and person; normal appearance; normal concentration span; an intact memory; cooperative and friendly behavior; good attention; appropriate affect/mood; clear and logical thought content; and good judgment and insight. (Tr. 345). She diagnosed Plaintiff with bipolar II disorder, depressed and assigned a Global Assessment of Functioning ("GAF") score of 73.[3] (Tr. 346).

---

2. In regard to Plaintiff's physical impairments, which did not arise until the hearing level, the ALJ determined the lack of medical treatments and very minimal findings on physical exams in the record support the exertional restriction to medium work. (Tr. 97-98). The record supports this finding and Plaintiff does not allege physical limitations in his brief; therefore, the Court will only discuss Plaintiff's alleged mental impairments.
3. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental*

Plaintiff then began regular counseling sessions with Dr. Keck-McNulty from 2008 through June 2009 and again between March 2010 and August 2011. (Tr. 557-642). During the pendency of this treatment, Dr. Keck-McNulty noted on many occasions Plaintiff's mood, thought process, behavior, and functioning were entirely "unremarkable" or positive. (Tr. 560, 562, 568-69, 571, 573-74, 576, 579, 581, 583, 585, 588, 591-92, 594, 597-99, 601-02, 604-07, 611-12, 614-15, 617-20, 623, 625-28, 630-33, 635-36, 638). During his treatment with Dr. Keck-McNulty, Plaintiff's GAF scores ranged from 65 to 80.[4] (Tr. 639-42).

Plaintiff also presented to Portage Path in October 2010 to establish psychiatric treatment and medication management. (Tr. 422-42). A mental status exam revealed largely normal results except that Plaintiff presented a depressed mood, rapid speech, and racing thought process. (Tr. 431-32). The clinician advised Plaintiff to continue treatment with Dr. Keck-McNulty. (Tr. 432). Plaintiff's diagnoses included bipolar II disorder, seasonal, and ADHD, combined type. (Tr. 433). A psychiatric evaluation resulted in Plaintiff receiving a GAF score of 50.[5] (Tr. 442).

On November 5, 2010, Dr. Keck-McNulty wrote a letter providing her opinion regarding Plaintiff's impairments and his ability to perform work. (Tr. 348). She opined Plaintiff's bipolar disorder symptoms of mood swings, anger, frustration, depression, hopelessness, and medication

---

*Disorders*, 32–33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A higher number represents a higher level of functioning. *Id.* GAF scores in the range of 71-80 generally connote that if symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in school work). *Id.*
4. *See DSM-IV-TR*, *supra*, note 3. A GAF score of 61-70 reflects some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. *Id.* at 34.
5. A GAF score between 41-50 indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job.)" *DSM-IV-TR*, at 34.

8

non-compliance, rendered him unemployable and unqualified to be the primary caregiver of his young son. (Tr. 348-49).

In November 2012, Plaintiff presented to Northeast Ohio Behavioral Health for mental health treatment. (Tr. 662-74). The diagnosis consisted of bipolar disorder and Plaintiff received GAF scores ranging from 65 to 68.[6] (Tr. 670, 674).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the Court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for DIB is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

---

6. *See DSM-IV-TR*, *supra*, note 4.

result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's RFC and can claimant perform past relevant work?

5. Can claimant do any other work considering his RFC, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The court considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff asserts reversal and remand are proper in this case because the ALJ: (1) violated the "treating physician" rule; and (2) failed to adequately account for Plaintiff's limitations

relating to difficulties maintaining concentration, persistence, and pace. (Doc. 16). Each of these assignments of error fail for the following reasons.

**Treating Source Rule**

Plaintiff argues the ALJ violated the treating physician rule by failing to provide "good reasons" for not assigning controlling weight to the opinion of Dr. Keck-McNulty, instead giving "great weight" to the opinions shared by both state agency psychological consultants. (Doc. 16, at 1, 7-11). Plaintiff further asserts the ALJ "telescop[ed]" the two-step analysis discussed in *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) into only one step. (Doc. 16, at 9). Defendant counters that the treating source rule does not apply in this case because Dr. Keck-McNulty, as a licensed professional clinical counselor, and not a licensed psychologist, is "not an acceptable medical source under the regulations", and her opinion should only be considered as an "other source". (Doc. 19, at 6-7). Alternatively, Defendant argues that even if Dr. Keck-McNulty does quality as a treating source, the ALJ properly provided "good reasons" for affording her opinion little weight. (Doc. 19, at 10).

The treating source rule states the medical opinions of treating physicians are generally afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). Under the regulations, a "treating source" includes an individual's own physician, psychologist, or "other acceptable medical source". 20 C.F.R. § 416.902. Other acceptable medical sources are enumerated in 20 C.F.R. § 416.913(a) as follows: licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. Evidence submitted by an individual not specifically mentioned in § 416.902 or § 416.913(a) are considered "other sources." 20 C.F.R. § 416.913(d).

11

Plaintiff asserts Dr. Keck-McNulty is a "treating psychologist" (Doc. 16, at 9), but this does not appear to be the case. Under Ohio law, "'[p]sychologist' means any person who holds self out to the public by any title or description of services incorporating the words 'psychologic,' 'psychological,' 'psychologist,' 'psychology,' or any other terms that imply the person is trained, experienced, or an expert in the field of psychology." Ohio Rev. Code § 4732.01.[7]

It does not appear Dr. Keck-McNulty holds herself out to be associated with psychology in anyway. Not only did she sign her November 5, 2010, opinion with "Clinical Therapist" and no mention of psychology; nowhere on her staff biography page at Northeast Ohio Behavioral Health is psychology mentioned in any way. *See* NE. OHIO BEHAVIORAL HEALTH, LTD., http://neobh.com/staff/keck.html (last visited on December 2, 2015). Consequently, she does not qualify as a "treating source", but rather an "other source" under the regulations; therefore, the ALJ was not required to afford her opinion deference.

"Other sources" may be used as evidence "to show the severity of [a claimant's] impairment(s) and how it affects [his] ability to work." 20 C.F.R. §404.1513(d)(1). The regulations provide specific criteria for evaluating medical opinions from "acceptable medical sources"; however, they do not explicitly address how to consider opinions and evidence from "other sources", including "non-medical sources" listed in 20 C.F.R. §§404.1513(d) and 416.913(d). SSR 06-3p clarifies opinions from other sources "are important and should be evaluated on key issues such as impairment severity and functional effects." 2006 WL 2329939,

---

7. Further, Dr. Keck-McNulty is not licensed as a psychologist in the State of Ohio, but rather as a Licensed Professional Clinical Counselor. OHIO LICENSE CTR., https://license.ohio.gov/lookup, Credential E.0004012 (last visited December 3, 2015). Conversely, the state agency reviewers, Robelyn Marlow, Ph.D. and Bonnie Katz, Ph.D., the opinions of which the ALJ gave great weight, hold themselves out to be psychologists, as they are both actively licensed psychologists in Ohio. *Id.*, Credential #4097 and #4257.

at *3 (Aug. 9, 2006). SSR 06-3p also states other sources should be evaluated under the factors applicable to opinions from "acceptable medical sources" – i.e., how long the source has known and how frequently the source has seen the individual; consistency with the record evidence; specialty or area of expertise; how well the source explains the opinion; supportability; and any other factors that tend to support or refute the opinion.

District courts in the Sixth Circuit vary widely in their interpretation of whether SSR 06-3p obligates an ALJ to discuss her reasons for not crediting opinions from "other sources." *See Southward v. Comm'r of Soc. Sec.*, 2012 WL 3887212, *2 (E.D. Mich. 2012). One line of cases provides that an "ALJ is not required to explain the weight given to the opinion of 'other sources', or to give reasons why such an opinion was discounted." *Ball v. Astrue*, WL 551136, at *5 (E.D. Ky. 2010); *see also Brewer v. Astrue*, 2012 WL 262632, at *10 (N.D. Ohio 2012) ("SSR 06-3p does not include an express requirement for a certain level of analysis that must be included in the decision of the ALJ regarding the weight or credibility of opinion evidence from 'other sources.'"); *Hickox v. Comm'r of Soc. Sec.*, 2010 WL 3385528, at * 7 (W.D. Mich. 2010) ("SSR 06-3p does not require that an ALJ discuss opinions supplied by 'other sources' or to explain the evidentiary weight assigned thereto . . . . While [SSR] 06-3p certainly encourages ALJ's [sic] to evaluate each opinion in the record, regardless of its source, the ruling is not written in imperative form." (internal quotations omitted), *adopted* 2011 WL 6000829 (W.D. Mich. 2011).

However, there are also cases which hold that an ALJ is required assign weight and explain the weight accorded to an other source. *Sommer v. Astrue*, 2010 WL 5883653, at *4 (E.D. Tenn. 2010) (holding remand required when "the ALJ failed to state that he was rejecting [nurse practitioner's] opinion or provide some basis for rejecting the opinion" even while

"acknowledg[ing] that it is not necessary to clear the same hurdle that must be surmounted to discount the opinion of a treating source").

Here, the ALJ provided a sufficient basis for the weight given to Dr. Keck-McNulty's opinion. In her decision, the ALJ noted there were "several stark points of inconsistency" between Dr. Keck-McNulty's opinion that Plaintiff would be unable to sustain work and her years of treatment notes. (Tr. 103). The ALJ noted later counseling notes revealed Plaintiff was stable and meeting his treatment goals. *Id.* The longitudinal treatment notes did not reveal any instability and instead were often "unremarkable" and largely void of references to anger or frustration issues. *Id.*; (Tr. 560, 562, 568-69, 571, 573-74, 576, 579, 581, 583, 585, 588, 591-92, 594, 597-99, 601-02, 604-07, 611-12, 614-15, 617-20, 623, 625-28, 630-33, 635-36, 638).

Furthermore, Dr. Keck-McNulty noted "recent past physical aggression", which Plaintiff denied at the hearing. *Id.* Also, Dr. Keck-McNulty never assigned Plaintiff GAF scores "below the mild range of symptoms and functional impairment." *Id.* Substantial evidence in the record supports these findings and the ALJ's conclusion there is "a marked disconnect" between Dr. Keck-McNulty's opinion that Plaintiff is unemployable due to his bipolar symptoms and her own treatment notes. *Id.* The ALJ also provided detailed and sufficient reasons for the weight she assigned to the state agency reviewer's opinions. (Tr. 102-03).

Even if Dr. Keck-McNulty was considered a "treating source", her November 5, 2010, opinion did not address Plaintiff's functional limitations, but rather his employability. (Tr. 348). Medical opinions are statements from physicians regarding the severity of an individual's impairments and the most that individual can still do despite the impairments, including any potential restrictions. 20 C.F.R. §§404.1527(a), 416.927(a). "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that [the Commissioner] will

14

determine you are disabled." §§404.1527(d), 416.927(d). Rather, these opinions are issues reserved to the Commissioner and an ALJ is not required to give these opinions controlling weight or special significance. *Id.*

This Court, however, finds Dr. Keck-McNulty to be an "other source" and substantial evidence supports the weight the ALJ assigned to both Dr. Keck-McNulty's opinion and the opinions of state agency reviewers. For those reasons, this assignment of error fails.

**RFC**

A claimant's RFC is an assessment of "the most [he] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence. § 416.929. An ALJ must also consider and weigh medical opinions. § 416.927. When a claimant's statements about symptoms are not substantiated by objective medical evidence, the ALJ must make a finding regarding the credibility of the statements based on a consideration of the entire record. SSR 96-7p, 1996 WL 374186, *1.

Plaintiff claims the ALJ erred in formulating her RFC because she failed to provide for Plaintiff's limitations in maintaining concentration, persistence, and pace. (Doc. 16, at 2, 11). The ALJ, however, did provide a series of limitations in these areas and Plaintiff has failed to meet his burden, under 20 C.F.R. § 404.1512, of showing his impairments warrant more restrictive limitations. Plaintiff also argues the hypothetical questions the ALJ posed to the VE did not accurately portray his moderate limitations in concentration, persistence, and pace, and is, therefore, a violation of *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504 (6th Cir. 2010). (Doc. 16, at 11).

In *Ealy*, the Sixth Circuit held that "[b]ecause the controlling hypothetical inadequately

15

described [the claimant's] limitations, the expert's conclusion that [the claimant] could [do other work] [did] not serve as substantial evidence that [the claimant] could perform this work." *Id*. at 517.

Relying on *Ealy*, courts have remanded where an ALJ finds at step three the claimant has moderate difficulties in concentration, persistence, or pace, but fails to adequately account for those difficulties in the RFC determination and at step five. *Williams v. Comm'r of Soc. Sec.*, 2013 WL 2319276, at *4-5 (N.D. Ohio 2013) (collecting cases). These courts reason that although an ALJ is not required to find a claimant had moderate difficulties in concentration, persistence, or pace, once he or she does, the limitation must be accounted for. *Id*.

Here, Plaintiff asserts "[t]he ALJ did not include in the RFC any limitations related to difficulties maintaining concentration, persistence and pace", which is simply not the case. (Doc. 16, at 2). The ALJ provided a series of limitations enumerated above in the "ALJ Decision" section of this opinion, including limitations to simple and routine tasks in a static environment, low-stress work, no direct contact with the public, and limited and superficial interaction with co-workers. (Tr. 96). Plaintiff also failed to refer to any evidence in the record which would support more restrictive limitations. The RFC limitations are based on substantial evidence in the record, including the opinions of state agency reviewers; therefore, these assignments of error fail as well.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the Court finds the Commissioner's decision denying SSI and DIB benefits supported by substantial evidence. The Commissioner's decision is, therefore, affirmed.

s/James R. Knepp II<br>
United States Magistrate Judge